IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JACKIE CARTER,

                            Plaintiff,                    OPINION AND ORDER

        v.                                               10-cv-510-wmc

DYLAN RADTKE, GREGORY GRAMS,
JANEL NICKEL, RICK RAEMISCH,
JOANNE LANE, MARY LEISER, and
ALICE ROGERS,

                            Defendants.

        In this civil action brought pursuant to 42 U.S.C. § 1983, inmate Jackie Carter
alleges that employees of the Wisconsin Department of Corrections violated his First
Amendment rights by screening his mail, censoring or blocking certain outgoing mail, and
disciplining him based on the content of this same mail in retaliation for the exercise of
his First Amendment rights.  Defendants have moved for summary judgment on several
grounds.  (Dkt. #68.)  For the reasons that follow, the court will deny defendants'
motion with respect to Carter's First Amendment claims against defendant Radtke for (1)
allegedly subjecting Carter's mail to special screening because of his complaints about
mail tampering filed in a separate lawsuit, and (2) censoring or blocking Carter's outgoing
mail based on inflammatory or factually inaccurate statements.  The court will also deny
defendants' motion with respect to Carter's First Amendment retaliation claim against
defendants Radtke and Nickel premised on Conduct Report Nos. 2085718, 2085714,
and 2085710.  With respect to each of these claims, the remaining defendants will be
given an opportunity to address why judgment should not be entered against them as a

matter of law pursuant to Fed. R. Civ. P. 56(f).  In all other respects, the court will grant defendants' motion and dismiss defendants Grams, Raemisch, Lane, Leiser and Rogers from this lawsuit.

## UNDISPUTED FACTS[1]

### A.  The Parties

Plaintiff Jackie Carter is, and was for all times relevant to this action, an inmate incarcerated at Columbia Correctional Institution ("CCI").  Defendants are or were employees of the Wisconsin Department of Corrections ("DOC"), working at CCI for all times relevant to this action, unless otherwise noted.  Defendant Dylan Radtke was an Administrative Captain.  Alice Rogers is a Financial Specialist 2.  Janel Nickel was the Security Director.  Joanne Lane was an Institution Complaint Examiner ("ICE") from May 23, 2010, to November 3, 2012.  Mary Leiser is a Program Assistant Advanced Confidential.  Gregory Grams was the Warden from December 26, 2004 to April 30, 2011.  Rich Raemisch was the Secretary of the DOC from September 2007 to January 2011.

### B.  Conduct Reports

#### i.    Overview

Inmates are issued adult conduct reports when they violate Wisconsin Administrative Code provisions.  When an inmate is issued a conduct report, the security

---

[1] The court finds that the following facts are material and undisputed, unless otherwise noted.

director or her designee reviews and signs off on that report.  As part of that review, the security director determines whether the violation constitutes a major or minor offense. A "major offense" is a violation of a disciplinary rule for which a major penalty may be imposed, including (1) a violation designated as a major offense under Wis. Admin. Code § DOC 303.68(3), (2) an offense for which the inmate has previously been warned or disciplined, (3) a violation that creates a risk of serious disruption or injury, or (4) a violation where the value of the property involved was high.  As part of her review, the security director does not determine the substantive merits of the report.

### ii.   Carter's Conduct Reports

Carter's First Amendment retaliation claim concerns five adult conduct reports, which the court will address in turn below.

#### a.  No. 1925435

On November 17, 2008, Radtke issued Carter report #1925435 for violations of Wis. Admin. Code § DOC 303.27 (lying) and § DOC 303.271 (lying about staff), which provides in pertinent part:

> On 11-14-08, (Capt. Radtke) was assigned to review and respond to correspondence from Inmate Jackie Carter #348415.  In the correspondence Inmate Carter discussed an interaction which took place at his cell door on 11-13-08 with myself and Officer Neumaier present.   Inmate Carter indicates he made several comments to me including "He said to come out and I told him my feet hurt" and "I have no shoes".   During my conversation with Inmate Carter he did not make these comments.  (303.27)  Inmate Carter also writes in correspondence that I (Capt Radtke) made the statement "I don't have to explain anything to you".  I did not make this statement at any time. (303.271) Inmate

> Carter's representation of the conversation he relates to is not
> a factual account.

(Affidavit of Dylan Radtke ("Radtke Aff."), Ex. A (dkt. #72-1) 1.)   Carter's

correspondence at issue in the conduct report was attached to the conduct report and

purports to be a letter from Carter to Security Director (and defendant) Janel Nickel

regarding his "legal mail being held and investigation abuse." (*Id.* at 4.)  Radtke contends

that he did not issue the report "under false pretenses." (Defs.' PFOFs (dkt. #70) ¶ 23.)[2]

After reviewing the report, Nickel allowed it to proceed, concluding that the

alleged violations constituted a major offense because: (1) Carter was already warned

about the same or similar conduct; and (2) the alleged violation created a risk of serious

disruption at the institution or in the community.  While Carter was given notice of a

disciplinary hearing proceeding, he refused to attend, choosing to submit a written

statement instead, which claimed that he was not guilty. (Radtke Aff., Ex. A (dkt. #72-

1) 6.)  The hearing was held on December 1, 2008.  Among other findings, the

committee concluded that "the event, more likely than not, unfolded as recorded" in the

conduct report. (*Id.* at 2.)  As a result, Carter was given 90 days disciplinary separation

---

[2] Carter now denies this, citing a portion of his deposition testimony in which he claims to have received "written falsified conduct reports to sort of try to deter me from trying to expose what's going on behind these walls." (Deposition of Jackie Carter ("Carter Depo.") (dkt. #81) 114.)  Defendants point out, however, that Carter failed to respond substantively to earlier interrogatories explaining why he is not guilty of the conduct described in this and the other reports. (Defs.' Reply to Defs.' PFOFs (dkt. #87) ¶¶ 23, 324-28.)  The court previously warned that Carter is "bound by his responses to date and the representation made through counsel." (12/16/13 Op. & Order (dkt. #67) 11.)  As some of defendants' proposed findings of facts illustrate, Carter also failed to substantiate his claims of false conduct reports when pressed at his deposition. (Defs.' Reply to Defs.' PFOFs (dkt. #87) ¶¶ 321-23.)  Still, as explained below, the fact that Carter's outgoing letters likely contained false statements does not foreclose his First Amendment claims.

and 10 days loss of recreation.  (*Id.* at 1.)  Carter did not appeal that disposition to the Warden.

### b.  No. 1793523

On January 19, 2009, Correctional Officer Cornelius issued Carter conduct report #1793523 for violating 303.271 (lying about staff), which provides in pertinent part:

> On the above date and time while make rounds in DS1, [Carter] asked me . . . to grab his mail.  While picking up [] Carter's mail, [] Carter told me that [Correctional Officer] Vetter called him a nigger and that he didn't want problems with [] Vetter.  I went and asked [] Vetter if [he] called [] Carter the "N" word and [] Vetter replied no.  I never called him the "N" word.  I informed Sgt. Anderson.

(Affidavit of Kenneth S. Cornelius ("Cornelius Aff."), Ex. A (dkt. #76-1) 1.)  Cornelius contends that he did not issue this report under false pretenses, but Carter maintains that the reports were fabricated.[3]

Captain Ashworth reviewed the report and found that the alleged violation constituted a major offense.  Carter was given a copy of the report and notice of a hearing and his rights, which he refused to acknowledge.  Carter also refused to attend the hearing, again submitting a written response, which claimed that he was not guilty.  (*Id.* at 6-14.)  During a hearing was held on January 30, 2009, the committee concluded that "the event, more likely than not, unfolded as recorded" in the conduct report.  (*Id.* at 2.) As a result, Carter was given 120 days disciplinary separation and 10 days loss of recreation.  (*Id.* at 1.)  Carter did not appeal this disposition to the Warden.

---

[3] Defendants also maintain that any dispute over this report is immaterial since the individuals named as defendants were not personally involved.  (Defs.' Reply to Defs.' PFOFs (dkt. #87) ¶¶ 38-39.)

### c.  No. 2085714

On July 12, 2010, Sergeant Bass issued adult conduct report #2085714 for violations of 303.271 (lying about staff) and 303.163 (threats).  The conduct report concerned an outgoing letter sent by Carter that contained the following statements:

> While in Prison I've discovered the most large scale nepotism, selective hiring, racism, the beatings, electrocuting of black men daily by a clan of white openly racist close friends and family members.  Deaths and abuse are rampant.
>
> Also there are nurses, doctors [etc.] That is the wives, husbands, etc. of the Co's in Wisconsin prisons.  So if the dad, son, sisters, lover etc. hates you then MaMa and Aunt does too!  So now the doctor Ms. Dalia Suliene is extremely dangerous.  She refuses and terminates much needed medications from us nothing ass niggers.  And allowed [us] to suffer.
>
> My mom[']s photos they stabbed the eyes out and drew fangs in her mouth.  And wrote Moose nigger bitch across her breast area.  My boys eyes were also Punched/ stabbed out and Kill niggar babies written across their foreheads.
>
> They spray chemical incapacitating agents, Black men chained to steel gates, and cut off their cloth[e]s with a scissors as 7-9 C.O.'s laugh as they talked about this myth (they say they heard about our peckers.  Pure sick racists.

(Affidavit of Brian T. Franson ("Franson Aff."), Ex. B (dkt. #71-2) 1-2.)[4]

In addition to those statements, the conduct report also indicated that Carter requested personal information about Dr. Suliene in this correspondence.  The two-page letter at issue was attached to the conduct report and is addressed to a Ms. Jane Eichwald in Darien, Connecticut.  (*Id.* at 13-15.)  In the letter, Carter seeks assistance in investigating the issues described.  (*Id.*)

---

[4] As explained below, Carter's mail was subject to screening during the summer of 2010.

Nickel reviewed the conduct report and classified these alleged violations as major offenses.  Carter received a copy of the report, notice of the hearing and his rights, which he refused to acknowledge.  Nevertheless, Carter submitted a written response to the report, claiming that he was not guilty of the offense. (*Id.* at 11.)[5]  At a hearing held on July 29, 2010, the committee found that the report writer, Sergeant Bass, was credible, and that the events more likely than not unfolded as described.  (*Id.* at 3.)  Carter claims that this report was also fabricated, though when pressed at his deposition, he failed to provide any specific facts that supported his broad allegations of inmate abuse.  (Defs.' Reply to Defs.' PFOFs (dkt. #87) ¶ 60.)  For this conduct, Carter received 240 days disciplinary separation.  (*Id.* at 2.)  Carter appealed that disposition to the Warden. While the Warden through his designee affirmed the decision, he did reduce the sentence to 180 days.  (*Id.* at 27.)

### d.  No. 2085718

For again violating 303.271 (lying about staff), Sergeant Bass issued a second conduct report on July 12, 2010.  Conduct report #2085718 also concerns an outgoing correspondence in which Carter allegedly makes the following statements:

> These prisons are ran/operated by a clan of all white 100% openly racist close friends and family members on every level. The complaint Dept., the deaths, what's being hidden, How many prisoners that has died, why, who's been killed, how and why are these things being kept quiet.  Things of the most barbaric type are happening to us black men and white men that associate with us.  Ruthless diabolical, continuous[,]

---

[5] Carter submitted one statement refuting the charges in Conduct Report Nos. 2085714, 2085717, 2085710, and 2085716.

> cunning[,] retaliatory, non-stop attacks one could ever imagine.
>
> I have been subjected to things that would've killed many. Right now!  I'm being subjected to abuse and conspiracy to hide the abuse. . . . To file a simple complaint/grievance is made painstaking!  . . . Falsified Major conduct reports are written on us by the racist!
>
> I've been barefoot for over a year!  My feet are swollen!  In extreme pain!  From hobbling barefooted on this concrete!

(Franson Aff., Ex. A (dkt. #71-1) 1-2.)  The conduct report goes on to describe Carter's representations about his attempts to procure shoes from his family.  (*Id.* at 2.)  Unlike the other conduct reports, the correspondence at issue does not appear to be attached to the report, or otherwise included in the record.[6]

Nickel reviewed the conduct report, and classified the alleged violations as major offenses for the same reasons she relied on in classifying the other reports described above.  Carter received a copy of the report and the typical notice, which he refused to acknowledge.   Carter refused to attend the disciplinary hearing but did submit a written statement in which he denied guilt.  (*Id.* at 6-7, 13-14.)  A hearing was held on July 29, 2010, which Carter refused to attend, and at which the committee found that:  the report writer, Sergeant Bass, was credible; Carter was not credible; and the events more likely than not unfolded as described.  (*Id.* at 3.)  Carter claims that this report was also fabricated, though when pressed at his deposition, Carter again failed to provide any specific facts in support of the broad allegations of inmate abuse described above. (Defs.'

---

[6] It appears that this letter may be the letter to the Legal Foundation discussed below in Facts C.iii.

Reply to Defs.' PFOFs (dkt. #87) ¶ 74.)  Defendants also contend that the individuals named as defendant in this action lack the necessary personal involvement with respect to the conduct report.  (*Id.*)  Carter received 210 days disciplinary separation.  (Franson Aff., Ex. A (dkt. #71-1) 1.)  He appealed this disposition to the Warden, but it was affirmed by the Warden's designee.  (*Id.* at 16.)

### e.  No. 2085710

On July 16, 2010, Sergeant Bass issued a third conduct report for violating 303.271 (lying about staff) and 303.25 (disrespect).  Conduct report #2085710 also concerns an outgoing correspondence containing many of the same or similar statements as in the letters described above, in particular:

> The staff are beating Black men and White men that are friends with the Blacks.  We can't report anything because every department is ran and operated by a clan of all white openly racist close friends, and family on every level. Including the Complaint Department and Nurses are wives, moms, sons, of the C.O.'s so we[']re being neglected medically too.

> Can you look up this deadly dangerous doctor her name i[s] Dalia Suliene and send me all of her information.  She has some shady skeletons in her closet.  You don't grow up and go to coll[e]ge and say When I grow up, I'm getting a job in a prison as a doctor.  Her license was taken away, she was fired and those are the people the state hires on a small pay because they can't get a job on the street.

(Franson Aff., Ex. C (dkt. #71-3) 1-2.)  According to the report, the letter also stated that "DOC employees are a clan of White racist, and that the staff have destroyed his property and denied him shoes and that staff are abusing him." (*Id.* at 2.)  The letter at

issue is addressed to E.P. Legal Services and is consistent with the description in the conduct report.  (Radtke Aff., Ex. E (dkt. #72-5).)

Nickel reviewed the conduct report, and classified the alleged violations as major offenses for the same reasons she relied on in classifying the other reports described above.  Carter received a copy of the report and the typical notice, which he similarly refused to acknowledge.   Carter also refused to attend the disciplinary hearing but did submit a written statement denying his guilt.  (Franson Aff., Ex. C (dkt. #71-3) 5-6.) During a hearing held on July 29, 2010, which Carter again refused to attend, the committee found that:  the report writer, Sergeant Bass, was credible; Carter was not credible; and the events more likely than not unfolded as described.  (*Id.* at 9.)  Carter claims that this report was also fabricated, though when pressed at his deposition, Carter again failed to provide any specific facts in support of the broad allegations of inmate abuse described above.  (Defs.’ Reply to Defs.’ PFOFs (dkt. #87) ¶ 92.)  Defendants also maintain that the individuals named as defendants in this action lack the necessary personal involvement with respect to the conduct report.  (*Id.*)  Carter received 300 days disciplinary separation.  (Franson Aff., Ex. C (dkt. #71-3) 1.)  He also appealed this disposition to the Warden, but it was affirmed by the Warden’s designee.  (*Id.* at 10.)

The total penalties imposed in Conduct Report Nos. 2085718, 2085714, and 2085710 (collectively referred to as the “208 conduct reports”) amounted to 670 days of disciplinary separation.  Under Wis. Admin. Code § 303.70(9)(c), however, disciplinary separation runs concurrently and, therefore, the practical consequence was *300* days in disciplinary separation.  (Defs.’ PFOFs (dkt. #70) ¶ 95.)

### iii.   Defendants' Involvement in Conduct Reports

With respect to the 208 conduct reports, defendant Radtke neither issued any reports nor did he preside as the hearing officer for those reports.  Defendant Radtke's only involvement is that he may have given Carter's letters (referenced in the 208 conduct reports) to Sergeant Bass for investigation.  Defendant Nickel did not author any of the conduct reports at issue.  Her involvement was limited to reviewing the reports to determine whether the allegations constituted a major offense.  Defendant Leiser did not issue or decide any of the relevant adult conduct reports issued to Carter.  Her only involvement was acting as Carter's advocate to ensure he was provided with due process.

Defendant Warden Grams had general supervisory authority over CCI operations, but he did not directly supervise the day-to-day decisions of security personnel or the daily activities of security staff within CCI.  In particular, Grams exercised no *day-to-day* supervisory authority over decisions by security staff as to whether to issue conduct reports or the disposition of those reports.  Specific to Carter's claims here, Grams did not issue or make decisions relevant to his conduct reports.  While Carter appealed the dispositions of three of those conduct reports as described above, Grams was not personally involved in the review of those appeals.  Rather, Deputy Warden Douma, as the warden's designee, was involved.

Former Secretary of the Department of Corrections Raemisch was even more removed from the other defendants' actions here, having no knowledge of, or personally involvement in, *any* decision relating to issuing Carter conduct reports, the disciplinary hearing or appeals concerning those reports.

11

### C. Claims Concerning Treatment of Carter's Mail

Carter also alleges that the following outgoing letters were tampered with and/or CCI staff unlawfully refused to mail them in violation of Carter's First Amendment rights: (1) letters that were found in the washing machine at CCI; (2) letters at issue in the 208 conduct reports; (3) letters tied to disbursement request and envelopes found at dkt. ##47-1 to 47-4; and (4) letters tied to the disbursement request and envelopes found at dkt. #42-1 at pp.44-53 and dkt. ##47-1 to 47-4.[7]

### i.    CCI's General Mail Practices on Outgoing Mail

Except for mail being sent to another inmate, outgoing mail is not normally opened or inspected by staff unless a mail monitor is in place.  If mail is being sent out using a legal loan, it must meet the legal loan policy (DAI Policy #30951.01) and the inmate must provide a disbursement request for approval.

Under the legal loan policy, "[p]ostage covered under legal loans includes first class mail to courts, sheriff[] departments for purposes of requesting service of pleadings, clerk of courts, witnesses, authorized attorneys, parties in litigation, the inmate complaint review system, the parole board and DAI Director of the Bureau of Classification and Movement for PRC appeals only."  (Radtke Aff., Ex. C (dkt. #72-3) 6 at § V.C.)  The policy also provides that "[i]nmates may use legal loan funds for postage by attaching a Disbursement Request (DOC-184) to the unsealed envelope.  The Disbursement Request must contain the complete mailing address and case and/or complaint number, if applicable."  (*Id.* at § V.C.1.)

---

[7] As discussed in the text, there is a good bit of overlap in these claims.

For the time period relevant to this lawsuit, Carter was approved for a legal loan on April 1, 2010, and he was over his legal loan limit on July 29, 2010.

All mail not subject to the legal loan policy must be mailed out by stamped envelope. Inmates may purchase stamped envelopes at the canteen. If an inmate lacks funds, inmates are also provided with one stamped envelope per week.

### ii.    Screening of Carter's Mail during the Summer of 2010

Carter's mail was being monitored from June 18 until August 7, 2010, to assist the Wisconsin Department of Justice with one of Carter's lawsuits, which claimed that members of CCI staff were stealing his mail. During this period, therefore, CCI was monitoring his mail to refute Carter's allegations. When an inmate's mail is being monitored, all incoming and outgoing mail is forwarded to the Captain's office for review and possible opening.

During the period of mail monitoring, the business office was instructed to forward Carter's mail to Captain Radtke. Defendant Radtke does not remember whether he opened or reviewed Carter's incoming or outgoing mail during this period.

### iii.    Carter's Attempt to Use Legal Loan Disbursements

In July of 2010, Carter attempted to have mail that did not qualify for use of legal loan, sent with disbursement requests rather than with stamped envelopes. Carter acknowledges that these attempts were contrary to the legal loan policy. On July 7, 2010, Carter submitted a disbursement request for postage for a letter to be mailed to the

E.P. Legal Services.  On July 8, 2010, Carter submitted a disbursement request for postage for a letter to be mailed to The Legal Foundation.[8]

On July 12, 2010, Radtke disapproved these disbursement requests because the letters were addressed to entities defendants maintain are not approved for legal loan use. Plaintiff disputes this, pointing to language in the policy allowing legal loans for postage for correspondence addressed to attorneys.  As defendants point out, however, the policy language limits correspondence to "authorized attorneys," without explaining what "authorized" means.  (Defs.' Reply to Defs.' PFOFs (dkt. #87) ¶¶ 145-146.)  Defendants maintain that Carter could have sent these letters out via stamped envelopes if the content of the letters were "truthful."  (Defs.' PFOFS (dkt. #70) ¶ 147.)  Plaintiff claims that defendants violated his First Amendment rights by "censoring" these letters based on "what they deemed to be insulting or inaccurate statements."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #84) ¶ 147.)

Radtke forwarded the E.P. Legal Services letter to Sergeant Bass for investigation and likely forwarded The Legal Foundation letter as well.  The E.P. Legal Services letter later formed the basis for Sergeant Bass's issuance of Conduct Report No. 2085710, and it appears that The Legal Foundation letter formed the basis for Conduct Report No. 2085718.

On July 20, 2010, Carter submitted a disbursement request for postage for an envelope addressed to Assistant Attorney General Monica Burkert-Brist.[9]   Rogers' co-

---

[8] These are the disbursement requests and envelopes described in and attached to Carter's Affidavit, available at dkt. ##47, 47-1 to 47-4.

14

worker J. Carey did not approve this disbursement request because Carter did not provide a case number.  Rogers had no involvement in the decision to approve this disbursement request.  Carter could have added the case number to the July 20, 2010, request and resubmitted it for processing, or could have sent the correspondence using a stamped envelope.

On July 21, 2010, Carter submitted two disbursement requests for postage for mail addressed to F.B.I. personnel.  Rogers did not approve these requests because Carter's envelopes were not addressed to a person or entity covered by the legal loan policy.  Carter could have sent these letters using stamped envelopes.

In late July 2010, Carter submitted at least one disbursement request for postage for an envelope addressed to Raemisch.  Carey did not approve this disbursement request because Carter did not provide a case number and because the letter was not addressed to a person or entity covered by the legal loan policy.  Rogers had no involvement in this decision.  Carter had the ability to send this letter by means of a stamped envelope, though, he contends, that if he had done so defendants would have censored his mail in violation of the First Amendment rights.  (Pl.'s Resp. to Defs.' PFOFs (dkt. #84) ¶ 165.)

On July 25, 2010, Carter submitted a disbursement request for postage for an envelope addressed to Magistrate Judge Crocker, in this court at the Western District of Wisconsin.  This request was denied by Carey because Carter did not provide a case number.  Rogers had no involvement in this decision.  Carter could have added the case

---

[9] This letter and the ones described below through July 25, 2010, are the ones described by Carter at dkt. #42.

number to the July 250, 2010, request and resubmitted it for processing, or could have sent the correspondence using a stamped envelope.

Defendant Raemisch exercised no day-to-day supervisory control over decisions concerning inmate mail, and specifically lacked any knowledge or personal involvement in any decisions regarding whether to allow Carter to send outgoing mail.

### D. Claims Concerning ICRS

#### i.   Overview

The DOC maintains an Inmate Complaint Review System ("ICRS") in Wisconsin adult correctional facilities.  An inmate begins the ICRS process by filing a complaint with the Inmate Complaint Examiner ("ICE") as his or her respective institution, consistent with the provisions of Wis. Admin. Code DOC Ch. 310.  After receiving a complaint, ICE decides whether the complaint should be accepted for filing or returned to the inmate under Wis. Admin. Code § DOC 310.09.  A complaint may be returned for a number of reasons, including the complaint was submitted after an inmate has already filed two offender complaints for the week, pursuant to § DOC 310.09(2).

If the complaint is not returned, ICE processes it, and ultimately recommends that the so-called "reviewing authority" either reject, dismiss or affirm the complaint.[10] Pursuant to § DOC 310.11(5), ICE may reject a complaint for the following reasons:

> (a) The inmate submitted the complaint solely for the purpose of harassing or causing malicious injury to one or

_____

[10] The "reviewing authority" is the warden, bureau director, administrator or designee who is authorized to review and decide an inmate complaint at the institution level.

more of the department's employees, agents, independent contractors, or any other person.

(b) The inmate does not raise a significant issue regarding rules, living conditions, or staff actions affecting institution environment.

(c) The inmate does not allege sufficient facts upon which redress may be made.

(d) The inmate submitted the complaint beyond 14 calendar days from the date of the occurrence giving rise to the complaint and provides no good cause for the ICE to extend the time limits.

(e) The issue raised in the complaint does not personally affect the inmate.

(f) The issue is moot.

(g) The issue has already been addressed through the inmate's prior use of the ICRS.

(h) The issue raised is not within the scope of the ICRS as defined in s. DOC 310.08.

Subsection 6 provides that "[a]n inmate may appeal a rejected complaint within 10 calendar days only to the appropriate reviewing authority who shall only review the basis for the rejection of the complaint. The reviewing authority's decision is final." Wis. Admin. Code § DOC 310.11(6).

### ii.   Defendants' Processing of Carter's Complaints Concerning His Mail

Lane was the Inmate Complaint Examiner at CCI from May 23, 2010, to November 3, 2012. As a result, all of the complaints that could form the basis for Carter's claims based on the ICRS process are limited to the time period from her start date of March 23, 2010, to the date plaintiff mailed his complaint in September 2010.

17

During this time period, Carter submitted eight offender complaints which were repeatedly not accepted and returned to him.  (Affidavit of Mary Leiser ("Leiser Aff."), Exs. F-G, J-M, P-Q (dkt. ##74-6 to 74-7, 74-10 to 74-13, 74-16 to 74-17).)[11]

- On July 21, 2010, Leiser received an offender complaint from Carter about his family not receiving his mail.  (Leiser Aff, Ex. F (dkt. #74-6).)  In the complaint, Carter writes about mail issues but does not allege involvement of Rogers or Radtke in withholding or tampering with his mail.  This complaint was not accepted and returned to Carter because he cannot file more than two complaints per calendar week, and Carter had filed two complaints earlier in the week both on July 19, 2010.  (Lane Aff., Ex. A (dkt. #73-1) p.35 (noting two accepted complaints filed on 7/19/2010).)  Carter attempted to file this complaint again on July 27, August 3, August 9, August 11, September 9, September 15, and September 23.  Each time the complaint was not accepted and returned because he had filed two other complaints that week which were accepted.  (*Id.* at pp.35-36.)

- On July 22, 2010, Leiser received Carter's offender complaint asserting that he was not receiving receipts for legal documents that were previously mailed.  (Leiser Aff., Ex. G (dkt. #74-7).)  Specifically, Carter stated that he wrote Rogers and she told Carter that mail is processed the day after Carter mails it.  This complaint was returned to Carter as "not accepted," because he had already filed two offender complaints that week which were accepted.  (*Id.* at p.35.)  Carter attempted to file this complaint again on July 27, August 3, August 9, August 11, September 9, September 15 and September 23.  Each time the complaint was returned without acceptance because Carter had filed two other complaints that week which had been accepted.  (*Id.* at pp.35-36.)

- On August 9, 2010, Leiser received an offender complaint from Carter about all of his property being taken, which allegedly interfered with his access to courts. (Leiser Aff., Ex. J (dkt. #74-10).)  This proposed complaint was also not accepted and returned to Carter because of the two-per-week limitation.  (Lane Aff., Ex. A (dkt. #73-1) p.35.)  Carter attempted to file this complaint again on August 11, August 13, August 16, August 19, September 15 and September 23.  Each time

---

[11] Given Lane's position as CCI's Examiner, she likely made the decisions to return these complaints, but (understandably enough) does not specifically remember doing so.  As the intake person for the ICE office, Leiser accepts an offender complaint or returns it to the inmate based on the directions given to her by ICE.  Leiser does not make any recommendations, such as dismissals or rejections, with respect to offender complaints.

the complaint was returned, it was because he had filed two other complaints that week that *were* accepted.  (*Id.* at pp.35-36.)

- Also on August 9, 2010, Leiser received an offender complaint from Carter concerning Captain Radtke's alleged interception, opening, resealing and returning of mail.  In particular, Carter alleged that Radtke obstructed mail to judges and Assistant Attorney General Burkert-Brist.  (Leiser Aff., Ex. K (dkt. #74-11).)  This proposed complaint was also returned to Carter because of the two-per-week limitation.  (Lane Aff., Ex. A (dkt. #73-1) p.35.)  Consistent with the above, Carter tried again on August 9, August 11, September 9, September 15 and September 23, and the complaint was again not accepted and returned to him because he had already filed two complaints which were accepted during the relevant calendar week.  (Lane Aff., Ex. A (dkt. #73-1) pp.35-36.)

- On August 10, 2010, Leiser received another offender complaint from Carter about alleged obstruction to his attempts to contact judges, legal representatives and family.  (Leiser Aff., Ex. L (dkt. #74-12).)  This proposed complaint, too, was returned to him that day and also on September 9, September 15 and September 23, because of the two-per-week limitation.  (Lane Aff., Ex. A (dkt. #73-1) pp.35-36.)

- On August 11, 2010, Leiser received an offender complaint from Carter about (1) the retaliatory confiscation of his hygiene products and other property, and (2) being barred from contacting the courts.  (Leiser Aff., Ex. M (dkt. #74-13).)  The proposed complaint was also returned to Carter because of the two-per week limitation.  Carter attempted to resubmit this complaint on September 9, September 15 and September 23.  Each time, his complaint went unaccepted and returned because of the two-per-week limitation.

- On September 9, 2010, Leiser received an additional offender complaint from Carter concerning his personal and legal property being withheld.  (Leiser Aff., Ex. P (dkt. #74-16).)  This proposed complaint was similarly returned to Carter because he had already filed two complaints in that calendar week.  Carter attempted to resubmit this complaint again on September 15 and September 23, but the complaint was not accepted and was returned for the same reason.

- Finally, on September 9, 2010, Leiser received an offender complaint from Carter about his difficulties with the mail.  (Leiser Aff., Ex. Q (dkt. #74-17).)  Although this proposed complaint was returned to Carter because of the two-per-week limitation, he attempted to resubmit it on September 15 and September 23.  Each time, the complaint was not accepted and was returned again because of the two-per-week limitation.

During the same period of time that each of the above complaints were returned, ICE accepted a large number of Carter's complaints for filing.  Indeed, in the eight month period before Carter filed this lawsuit in September 2010, the CCI intake personnel accepted over 80 of Carter's ICRS complaints for filing.  Still, Carter contends that the administrative regulations provide that the ICE could have waived the limitation "for good cause," and that, in particular, "ICE shall exclude complaints that raise health and personal safety issues from this limit."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #80) ¶ 190 (quoting Wis. Admin. Code § DOC 310.09(2)).)  Carter further contends that he had "good cause" for filing each of his complaints in excess of the two-per-week limitation, although he fails to explain or offer evidence in support of that contention.  (*See, e.g.*, Pl.'s Resp. to Defs.' PFOFs (dkt. #80) ¶ 199.)

In addition, Examiner Lane actually participated in decisions on four *accepted* offender complaints relating to mail issues during this same period of time.[12]

- On August 3, 2010, the ICE office issued a receipt to Carter to confirm that Offender Complaint CCI-2010-15980 had been accepted for filing. In the complaint, Carter alleged that his legal mail was not being allowed out of the prison on July 19, 2010.  (Lane Aff., Ex. M (dkt. #73-13).)  Carter indicated in the complaint that Radtke had knowledge that his mail was not being sent.  Lane contacted Sergeant Shimpach from the mailroom and he stated that all mail is processed and mailed as it is received from the Business Office.[13]  On that basis, Lane rejected the complaint.  Carter appealed the rejection to the reviewing authority, who found the rejection appropriate.

- On September 7, 2010, the ICE office issued a receipt to Carter to confirm that Offender Complaint CCI-2010-18504 had been accepted for filing.  (Lane Aff.,

---

[12]  Affidavit of Joanne Lane ("Lane Aff."), Exs. M-P (dkt. ##73-13 to 73-16).

[13] Of course, we know from the discussion above that Carter's mail was subject to special screening until August 7, 2010, likely right around when Lane contacted Shimpach.

Ex. N (dkt. #73-14.)   In the complaint, Carter alleged that "instructions for incoming/outgoing [mail] are not being allowed when mail is not delivered or received." (*Id.* at p.8.)   There is no mention of Radtke or Rogers in this complaint.   Lane rejected the complaint because it did not allege sufficient facts. In particular, Lane found that Carter did not provide the date or time, or identify the specific mail at issue.   Carter appealed the rejection, but the reviewing authority found that the rejection was appropriate.   (Oct. 13, 2010 final decision)

- Also on September 7, 2010, the ICE office issued a receipt to Carter to confirm that Offender Complaint CCI-2010-18523 had been accepted for filing.   (Lane Aff., Ex. O (dkt. #73-15).)   In this complaint, Carter alleged that his mail to legal representatives was not allowed out of the prison on July 27, 2010.   Carter does not mention either Rogers or Radtke in this complaint.   Lane rejected this complaint because:  (1) Carter did not submit any proof or evidence of his mail being opened; (2) Carter did not attempt to resolve this issue with Radtke; and (3) Carter continually ignored the 2 complaint per week maximum under the ICRS. Carter appealed this rejection, but the reviewing authority found it to be appropriate.

- On October 25, 2010, the ICE office issued a receipt to Carter to confirm that Offender Complaint CCI-2010-22289 had been accepted for filing.   In the complaint, Carter alleges that Officer Graack, Sergeant Bass and Lieutenant Kelly prevented him from contacting the courts, family and lawyers by not giving him his property.   (Lane Aff., Ex. P. (dkt. #73-16).)   While Carter reference Radtke in the complaint, he does not allege that Radtke was involved in any alleged withholding of mail.   Lane rejected the complaint because this issue had already been raised in three prior offender complaints (Nos. 2010-20664, 2010-19616, and 2010-21512).   Carter appealed the rejection, but the reviewing authority also found it to be appropriate.

Defendants contend that Lane rejected each of these complaints because Carter failed to follow ICRS procedures and rules.   Carter disputes this, asserting that he "followed the same practice whenever he attempted to file complaints and Lane's rejection of these four offender complaints was arbitrary." (Pl.'s Resp. to Defs.' PFOFs (dkt. #80) ¶ 196.)

OPINION

Carter was allowed to proceed on First Amendment claims against defendants Rogers and Radtke for blocking his outgoing mail and against defendants Radtke, Grams, Nickel and Leiser for issuing conduct reports in response to his attempts to communicate with the outside world about alleged mistreatment at Wisconsin prisons; a claim against defendant Lane and Leiser for failing to process grievances with respect to his conduct report and outgoing mail; and a deliberate indifference claim against defendant Raemisch based on his knowledge of this wrongdoing and failure to do anything about it.  (6/7/13 Op. & Order (dkt. #30).)  The court will address defendants' challenges to these claims in turn.

## I.  First Amendment Claims

Plaintiff alleges a First Amendment claim against defendants Rogers and Radtke for blocking his outgoing mail, and a First Amendment retaliation claim against defendants Radtke, Grams, Nickel and Leiser based on Carter's allegation that these defendants issued false conduct reports in response to his attempts to communicate with the outside world about alleged mistreatment at Wisconsin prisons.

The court understands Carter's First Amendment claims to challenge three, related actions: (a) screening of his mail, including reading outgoing legal mail; (b) censoring of outgoing mail by refusing to allow him to send it out; and (c) issuing of conduct reports based on lying in outgoing correspondence.  Because defendants challenge whether Carter engaged in protected activity, the court considers his First Amendment and First Amendment retaliation claims together.

22

### A. Screening of Outgoing Mail

Defendants' decision to censor or block certain mail began with the decision to subject his mail to special screening.  There is no dispute that Carter's mail was subjected to special screening for approximately two months during the summer of 2010.  In his declaration, Radtke explains,

> Carter's mail was being monitored from June 18, 2010 until August 17, 2010 to assist the Wisconsin Department of Justice with a litigation matter.  Specifically, Carter had filed a lawsuit claiming that CCI staff was stealing his mail and CCI staff was monitoring mail traffic in order to refute Carter's allegations.  When an inmate's mail is being monitored, all incoming and outgoing mail is forwarded to the Captain's office for review and may be opened.

(Radtke Decl. (dkt. #72) ¶ 23.)  Rogers also explains that "[p]ursuant to an email from Captain Radtke dated June 2, 2010, the business office was instructed to forward mail to Captain Radtke prior to the business office sending a response to Carter."  (Rogers Decl. (dkt. #75) ¶ 18.)  While not entirely clear due to Radtke's use of the passive voice, it would certainly appear that Radtke initiated this mail monitoring, though perhaps he did so under the direction of the Wisconsin Department of Justice.  In any event, there is no dispute that defendant Radtke screened Carter's mail in response to Carter's complaints about mail tampering filed in a different lawsuit.[14]

While inmates retain the right under the First Amendment to send mail, searches of inmates' mail is permissible for security purposes, such as searching for contraband, escape plans, and the like.  *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999) ("[P]rison

---

[14] In May and June 2010, Carter filed several letters with the court in Case No. 09-cv-437, complaining of mail tampering.  (Case No. 09-cv-437 (dkt. ##24-25, 27-30).)

security is a sufficiently important governmental interest to justify limitations on a prisoner's first amendment rights." (internal quotation marks and citation omitted)); *Gaines v. Lane*, 790 F.2d 1299, 1304 (7th Cir. 1986) ("[P]rovisions of this type do not impermissibly intrude on first amendment rights."). Consistent with this, courts have held that subjecting inmates to targeted mail monitoring or screening does not implicate the First Amendment so long as the basis for special screening is reasonably related to a legitimate state interest. *See, e.g., Duamutef v. Hollins*, 297 F.3d 108, 113 (2d Cir. 2002) (holding that a 30-day watch placed on plaintiff's mail was reasonably related to legitimate penological interests where plaintiff had history of disciplinary actions relating to his involvement in a revolutionary group and had a book entitled *Blood in the Streets* mailed to him).

However, Carter's mail was monitored not because of any concern with prison security or order, but rather to collect evidence to refute his claims of mail tampering. Even if one were inclined to look past the irony of such a justification, subjecting an inmate's mail to special screening *because* of protected activity implicates the First Amendment. *See Hall v. Curran*, 818 F.2d 1040, 1044-45 (2d Cir. 1987) (finding fact issue as to whether 60-day mail watch was because of concern about "militant activities" as reflected in the official memoranda or because of "Hall's criticisms of prison administration and his political statements"). Given that Carter's mail was not just being logged and copied for the claimed purpose of responding in another lawsuit, but actually

read and acted upon when critical of the prison and its personnel, there is at least room for the trier of fact to doubt the defendants' stated purpose even if legitimate.[15]

In addition to targeting Carter's mail for special screening, defendant Radtke acknowledges that he read Carter's outgoing mail addressed to legal organizations, this court, an Assistant Attorney General with the State, the F.B.I., and perhaps other entities subjected to special administrative rules. Wis. Admin. Code § DOC 309.04(3) governs outgoing mail to such individuals, providing in pertinent part:

> **(3)** Institution staff may *not* open or read for inspection mail sent by an inmate to any of the parties listed in pars. (a) to (j), unless the security director has reason to believe that the mail contains contraband. . . .
>
> (a) An attorney.
>
> (b) The governor of Wisconsin.
>
> (c) Members of the Wisconsin legislature.
>
> (d) Members of the United States congress.
>
> (e) The secretary of the department.
>
> (f) The administrator of the division.
>
> (g) The attorney general or an assistant attorney general of Wisconsin.
>
> (h) An investigative agency of the federal government.
>
> (i) The clerk or judge of any state or federal court.
>
> (j) The President of the United States.

(emphasis added.)

---

[15] There is a separate question, which may be for the court, of whether defendants' actions of reading the content of Carter's communications was sufficiently narrowly tailored to further the government interest of disputing his mail tampering claims.

Since defendant Radtke's stated reason for screening plaintiff's mail had nothing to do with a concern about contraband, or other security interest, any review of Carter's addressed mail to the outgoing entities listed above appears to violate § DOC 309.04(3). Still, the fact that defendants' conduct violated an administrative rule does not give rise to a constitutional violation.  *See Guarjardo-Palma v. Martinson*, 622 F.3d 801, 806 (7th Cir. 2010) (finding violation of Wis. Admin. Code § DOC 309.04(3) "is not a ground for a federal civil rights suit"); *see generally Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) (explaining that § 1983 provides a remedy for constitutional violation, not violations of state statutes and regulations).

The Seventh Circuit has recognized that an inmate's "legal mail" is "entitled to greater protections because of the potential for interference with his right of access to the courts." *Kaufman v. McCaughtry*, 419 F.3d 678, 685-86 (7th Cir. 2005).  As such, mail to and from attorneys representing inmates or attorneys from whom inmates are seeking representation is privileged, while the administrative provision described above sweeps more broadly, reaching beyond documents subject to the attorney-client privilege. Perhaps, Carter's letters to the E.P. Fund and The Legal Foundation could be deemed *requests* for counsel, and therefore subject to greater protection, but the court need not resolve this issue, since any claim arising out of Radtke's actual reading of these letters is subsumed by Carter's broader claim for the censoring of his letters as discussed below.

As for the more narrow decision to target Carter for additional screening in response to his complaints about mail tampering, Carter has established a *prima facie* case for retaliation under the First Amendment on the undisputed facts.  To state a claim for

26

retaliation under the First Amendment, Carter must prove that:  (1) he was engaged in a constitutionally protected activity; (2) he suffered a deprivation that would likely deter a person from engaging in the protected activity in the future; and (3) the protected activity was a motivating factor in defendants' decision to take retaliatory action.  *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).  If Carter makes this initial showing, then the burden shifts to defendants to demonstrate that they would have taken the same actions "even in the absence of protected conduct."  *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011).

Here, Carter meets all three elements of a *prima facie* case.  As an initial matter, it is well-established that accessing the courts to complain about prison conditions constitutes protected activity.  *See, e.g.*, *Bridges*, 557 F.3d at 551-52 (finding protected activity where prisoner filed affidavit in support of another inmate's lawsuit against prison).  Moreover, having mail subjected to special screening, including reading of the mail, would likely deter a reasonably person from engaging in protected activity in the future.  Finally, defendant concedes -- indeed offer as proposed facts -- that Radtke subjected Carter's mail to special screening and directed Rogers to forward Carter's mail to him during the summer of 2010 *because of* Carter's filing of complaints concerning mail tampering in a different lawsuit.  On this record, judgment in favor of *plaintiff* appears appropriate, but, as contemplated by Federal Rule of Civil Procedure 56(f), the court will provide defendant an opportunity to describe any remaining issues of fact or law as detailed below in the last section of this opinion.

### B. Censoring of Outgoing Mail

Carter also asserts a claim based on defendants' decision to censor or block his outgoing mail.  As far as the court can discern, this claim concerns two general categories or groups of letters.[16]  The first group concern letters to the F.B.I. (dkt. #42-1 at pp.50, 52), Attorney Monica Burkert-Brist (*id.* at p.51), former Secretary Rick Raemisch (*id.* at p.53) and U.S. Magistrate Judge Crocker (*id.* at p.47).  The second group concern letters to the Legal Foundation (dkt. #47-2 at p.1), and E.P. Legal Services (dkt. #47-4 at p.1.).  The latter letters were also the subject of the 208 conduct reports.

With respect to the first group of letters, Carter was not blocked from sending these letters.  Rather, his requests for disbursement from his legal loan were rejected for various reasons, most notably that Carter failed to provide a case number.  In response to defendants' proposed findings of fact, Carter does not dispute that his "attempts to have mail, which did not qualify for use of legal loan, sent under disbursement request instead of stamped envelopes is contrary to policies and procedures."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #84) ¶ 140).  Putting aside the issue of whether a misapplication of the legal loan policy could rise to the level of a constitutional violation, the undisputed facts demonstrate that defendants appropriately denied Carter's disbursement requests for these pieces of mail.[17]  As such, the court will grant defendants summary judgment based on any claim premised on defendants' denial of disbursements from his legal loan.

---

[16] Defendants describe four categories of overlapping claims (Defs.' Opening Br. (dkt. #69) 28), which the court condenses into two.

[17] Of course, Carter could have sent these letters out via stamped envelopes.

Carter also complains -- and defendants do not dispute -- that defendants blocked a second group of letters to the E.P. Legal Services and the Legal Foundation because the content of the letters was not "truthful."  (Defs.' Reply to Defs.' PFOFs (dkt. #70) ¶ 147.)  In *Procunier v. Martinez*, 416 U.S. 396 (1974), the Supreme Court considered the First Amendment rights of prisoners with regard to mail, holding:

> [C]ensorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.

*Id*. at 413-14.  In *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989), the Supreme Court limited the holding in *Procunier* to outgoing mail, and applied the more relaxed standard set forth in *Turner v. Safely*, 482 U.S. 78 (1987) -- that First Amendment restrictions on prisoners must be "reasonably related to legitimate penological interests" -- to incoming mail.  *See Koutnik v. Brown*, 456 F.3d 777, 784 & n.4 (7th Cir. 2006) (reaffirming application of *Procunier* in outgoing mail claims).

Defendants now argue that the court should apply the more lenient *Turner* standard to outgoing mail claims, like Carter's, because of the Seventh Circuit's use of the *Turner* standard to address *both* incoming and outgoing mail claims in *Woods v. Commissioner of the Indiana Department of Corrections*, 652 F.3d 745 (7th Cir. 2011).  In

support of their argument, defendants contend that "the holding of *Koutnik* [applying *Procunier* to outgoing mail claims and *Turner* to incoming] has either been overruled *sub silentio* or it has been limited." (Defs.' Br. (dkt. #69) 30.) The problem with defendants' argument, however, is that the Supreme Court in *Thornburgh* -- not the Seventh Circuit in *Koutnik* -- announced the holding that outgoing mail should be treated differently than incoming mail, applying the *Procunier* standard to the former, and *Turner* to the latter. Regardless of the reason for the *Woods* court's application of *Turner* to both types of mail, neither the Seventh Circuit nor this court can overrule Supreme Court precedent. *See United States v. Pearce*, No. 07-2046, 2008 WL 356787, at *1 (7th Cir. Feb. 11, 2008) ("Only the Supreme Court is entitled to overrule one of its decisions[.]"). In any event, defendants have not only failed to direct this court to any Supreme Court cases calling into question the holding of *Procunier* as it applies to outgoing mail, but have failed to point to any Seventh Circuit decision explicitly questioning its application.

With that challenge aside, the court now turns to *Procunier*'s application to this case. In *Procunier*, the court struck down a regulation which barred letters that "unduly complain," "magnify grievances," or express "inflammatory political, racial, religious or other views" of "defamatory material," finding that this censorship was not justified by a legitimate government interest, like prison security and order. 416 U.S. at 413-16. Applying *Procunier*, courts have found the censorship of similar outgoing letters, or punishment based on those letters, violates a prisoner's First Amendment rights. *See, e.g., Loggins v. Delo*, 999 F.2d 364 (8th Cir. 1993) (affirming district court's finding that disciplinary action premised on letter to prisoner's describing a "beetled eye'd bit-- back

30

here who enjoys reading people's mail" and "[w]as hoping to read a letter someone wrote to their wife talking dirty sh--, so she could go in the bathroom and masturbate" violated prisoner's First Amendment rights); *Todaro v. Bowman*, 872 F.2d 43, 49 (3d Cir. 1989) (vacating district court's entry of summary judgment to defendant, finding fact issue as to whether prison retaliated against inmate for sending letters to the ACLU criticizing prison conditions);  *Hall v. Curran*, 818 F.2d 1040, 1042, 1045 (2d Cir. 1987) (finding genuine issue of material fact as to whether prison censored and retaliated against inmate based on letter to Amnesty International in which plaintiff "described physical abuse of prisoners"); *McNamara v. Moody*, 606 F.2d 621 (5th Cir. 1979) (finding refusal to mail prisoner's letter to his girlfriend in which he described a prison employee "while reading mail, engaged in masturbation and 'had sex' with a cat" in violation of the First Amendment); *Gee v. Ruettgers*, 872 F. Supp. 915, 919 (D. Wyo. 1994) (denying defendant's motion for summary judgment where prison officials censored plaintiff's outgoing communication containing false information about prison conditions sent to his family, because prison officials failed to explain how the letter threatened security or order).

In the face of this case law, defendants nevertheless argue that their decision to block Carter's mail, *and* to punish him for these letters, was legal because Carter was lying, rendering the content of his letter without First Amendment protection.  (Defs.' Opening Br. (dkt. #69) 23-24, 29 n.4.)[18]  In support, defendants cite to cases where

---

[18]  Plaintiff purports to dispute whether the content of his letter was false, but, as explained in the fact section above, the court finds plaintiff's support -- one sentence in

courts have held that "false allegations are not protected by the First Amendment." (*Id.* at 24.)  Critically, however, none of these cases involve false statements made in outgoing mail; rather, all concern false statements in internal prison communications.  *See Hale v. Scott*, 371 F.3d 917, 919 (7th Cir. 2004) (holding that inmate's allegation in his inmate grievance of a rumor of sexual misconduct by a prison guard was not privileged); *Fitzgerald v. Greer*, No. 07-C-61-C, 2007 WL 5497185, at *2 (W.D. Wis. Oct. 3, 2007) (denying plaintiff right to proceed on a retaliation claim where he lied to health services about his medical status); *Madyun v. Smith*, No. 07-C-318-C, 2007 WL 2220259, at *10 (W.D. Wis. July 31, 2007) (citing *Hale* warning to plaintiff of the difficulty in proving retaliation in screening order, and stating that there would be no violation if he were lying because "such actions are not protected by the Constitution").

Though defendants fail to acknowledge it, context matters.  While the statements in Carter's letters to the two legal organizations may not be protected if made internally (whether to another inmate, in a letter to a prison official, in an internal grievance, or even if spoken to a prison guard), they are protected when sent in outgoing correspondence to a third party.  Indeed, *Procunier* instructs that the content is protected even if it contains "unflattering or unwelcome opinions or factually inaccurate statements."  416 U.S. 396, 413-14; *see also Carroll v. Tucker*, No. 00-2455, 2001 WL 690822, at *2 (7th Cir. June 18, 2001) (unpublished) (discussing distinction between situations where prisoner intends for letter to be read by prisoner official as compared to

---

his deposition testimony where he simply states that the conduct reports were fabricated -- wholly insufficient to raise a disputed issue of fact.  *See supra* n.3.

instances where the outgoing correspondence was solely for the letter's addressee, and finding First Amendment violation with respect to the latter, but not the former); *Loggins*, 999 F.2d at 367-68 (discussing *McNamara*, 600 F.2d at 624) (explaining that if inflammatory remarks had been made directly to the prison staff instead of communicated in mail to a third party, may be properly subject to disciplinary action). In censoring these letters and punishing Carter, defendants relied on Wis. Admin. Code § DOC 303.27, which provides:  "Any inmate who makes a false written or oral statement which may affect the *integrity*, safety or security of the institution is guilty of an offense." (Emphasis added.)[19]  *Procunier* and subsequent cases, however, make clear that the "integrity" of the institution is not a legitimate interest when censoring *outgoing* mail; rather any regulation or practice that censors outgoing mail must further prison security, order or rehabilitation.

The reason for the differential treatment between incoming and outgoing mail makes sense:  the relationship between inmates' speech *outside* of prison and the protection of prison security, order, and perhaps to a lesser extent, rehabilitation, is far more attenuated than speech occurring *within* the prison.  Certainly, there are instances where speech outside of the prison walls could implicate these legitimate government interests, but defendants do not even attempt to justify their actions in this lawsuit on one of those bases.

---

[19] Wis. Admin. Code § DOC 303.271 concerns lying about staff and similar false statements.

While not argued in their brief in support of summary judgment, the record suggests that defendants arguably had a legitimate basis for censoring the letters to E.P. Legal Services and to Ms. Jane Eichwald in Darien, Connecticut.[20]  In both letters, Carter seeks personal information about a prison doctor Dalia Suliene.  (*See* Franson Aff., Ex. B (dkt. #71-2) 1-2; *id.*, Ex. C (dkt. #71-3) 1-2.)  Seeking personal information about Dr. Suliene could be conceived as threatening to her, and therefore form a proper basis for both blocking these letters and punishing Carter for its content.  *See Chavis v. Struebel*, 317 F. Supp. 2d 232, 238 (W.D.N.Y. 2004) (holding prisoner could be disciplined for complaint letter threatening to "get even with" officers who searched his cell).

Accordingly, the court will deny defendants' motion with respect to Carter's claim that defendants blocked or censored his outgoing mail in violation of his First Amendment rights.  At the screening stage, Carter was granted leave to proceed on these claims against Radtke and Rogers.  Because the undisputed record demonstrates that Rogers' role was limited to denying disbursement requests, she will be dismissed from this action.  On the current record, Radtke appears to concede that he made the decision not to send these letters.  (Radtke Aff. (dkt. #72) ¶ 23 (acknowledging that he likely "opened and reviewed Carter's incoming and/or outgoing mail during the period of mail monitoring").)

Entry of judgment in plaintiff's favor and against defendant Radtke appears appropriate on Carter's First Amendment claim based on the censoring of at least his

---

[20] From the current record, it is unclear whether Carter's letters to Ms. Jane Eichwald in Darien, Connecticut, the subject of the No. 2085714 was also blocked from mailing.

letter addressed to The Legal Foundation.  As contemplated by Rule 56(f), however, the court will provide defendant an opportunity to describe any remaining issues of fact or law before doing so.

### C. Conduct Reports

Carter next contends that defendants Radtke, Nickel, Leiser and Grams violated his First Amendment rights by issuing conduct reports for complaining about prison conditions. Because there are five conduct reports at issue, the court will consider defendants' motion with respect to each report.

#### i.   Conduct Report No. 1793523

Correctional Officer Cornelius issued conduct report #1793523 for violating 303.271 (lying about staff) based on Carter's oral statement to Cornelius that Correctional Officer Vetter called him a "nigger."  ("Cornelius Aff."), Ex. A (dkt. #76-1) 1.)  This speech in no way involves outgoing mail, and therefore is not subject to the additional protections described in *Procunier*.  Putting aside the issue of whether this speech is protected, none of the individuals involved in this conduct report are named as defendants.  As such, the court need not consider whether plaintiff has established a prima facie case for retaliation under the First Amendment, because defendants Radtke, Nickel, Leiser and Grams were not involved in the decision to issue the report, the screening of the report, the disciplinary hearing, or the appeal (or, rather, lack thereof).[21]

---

[21] As discussed in the next section, defendants argue that any claim for retaliation premised on the No. 1925434 conduct report should be dismissed for failure to exhaust his administrative remedies.  While defendants did not raise this defense with respect to

Accordingly, the court will grant defendants' motion for summary judgment on Carter's retaliation claim premised on the No. 1793523 Conduct Report.

### ii.   Conduct Report No. 1925434

This conduct report concerns a letter to Security Director Nickel in which Carter states that he complained to Radtke and another C.O. about his lack of shoes and Radtke's response in that conversation.  (Radtke Aff., Ex. A (dkt. #72-1) 1.)  Radtke issued the conduct report for violating § DOC 303.27 (lying) and § DOC 303.271 (lying about staff).  Unlike the letters underlying the 208 conduct report, this letter involves an internal prison communication, not outgoing correspondence.  As such, the heightened standard in *Procunier* does not apply.  *See Carroll*, 2001 WL 690822, at *2.  Still, the court need not reach the merits of this claim, because the undisputed facts demonstrate that Carter failed to exhaust any retaliation claim based on this conduct report -- a substantive challenge, rather than a procedural one -- by failing to appeal the disposition to the warden.  *See Lindell v. Frank*, No. 05-C-003-C, 2005 WL 2339145, at *27-28 (W.D. Wis. Sept. 23, 2005) ("If the issue is related to a conduct report, the inmate must raise it at the time of his disciplinary hearing and again on appeal to the warden, assuming the matter is not resolved at the disciplinary hearing stage.").[22]  As such, the

---

the 1793523 conduct report -- relying instead on their argument that none of the defendants were involved in the conduct report -- Carter's failure to appeal the disposition of the 1793523 conduct report to the warden would also be grounds for dismissing this claim.

[22]  Defendants acknowledge their failure to raise this exhaustion defense in an earlier motion for summary judgment.  (Defs.' Opening Br. (dkt. #69) 25.)  By failing to do so, defendants, however, have not waived the argument, since the court provides an early

court will grant defendants' motion for summary judgment as to the No. 1925434 conduct report based on Carter's failure to exhaust his administrative remedies.

### iii.   208 Conduct Reports

With respect to the 208 conduct reports, defendants' core argument is that Carter was not engaging in protected activity, because the correspondence underlying the conduct reports contains lies.  The court has already addressed this issue above in its discussion of Carter's claim that defendants blocked his mail in violation of his First Amendment rights.[23]  As such, Carter has demonstrated as a matter of law that he was engaging in protected activity of complaining about prison conditions in outgoing letters. The court further finds plaintiff has met his burden of demonstrating that the writing of the letters was a motivating factor in defendants' decision to issue him conduct reports. Moreover, it is well-established that disciplinary separation would likely deter a person from engaging in the protected activity in the future, or at least Carter has raised a

---

opportunity to dispose of a case for failure to exhaust largely for the benefit of defendants.

[23] While not argued in their summary judgment submission, Nickel may have justified her decision to classify the violations in the 208 conduct reports as "major violations," in part, because the violations created a risk of serious disruption.  (Nickel Aff. (dkt. #78) ¶ 11.)  Even if defendants had attempted to rely on prison order and security as a basis for blocking these letters and disciplining Carter based on their content, however, "prison officials must point to *some* evidence showing that their fear is a reasonable one." *Koutnik v. Berge*, No. 03-C-345-C, 2004 WL 1629548, at *7 (W.D. Wis. July 19, 2004); *see also Simpson v. Nickel*, 450 F.3d 303, 308 (7th Cir. 2006) (courts must address factual disputes notwithstanding prison administrative findings, "otherwise prison disciplinary boards could immunize guards who violate prisoners' rights, and the act of penalizing speech would be self-vindicating").  This, defendants have not done.

genuine issue of material fact with respect to that element of his retaliation claim.  *See Bridges*, 557 F.3d 541 (listing discipline as a retaliatory act).

The more interesting question is whether the defendants named in this claim were sufficiently personally involved in the conduct reports and subsequent punishment to be held liable for retaliation.  In the face of defendants' argument that they were not, plaintiff now moves for leave to amend his complaint to add Sergeant Bass, the individual who issued all three conduct reports, as a defendant pursuant to Fed. R. Civ. P. 20.  (Dkt. #85.)  No doubt Rule 20 *permits* Bass to be added, but plaintiff's request to amend his complaint is governed by Fed. R. Civ. P. 15(a)(2).  Under Rule 15, "leave is inappropriate where there is undue delay, bad faith, dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment."  *Villa v. City of Chi.*, 924 F.2d 629, 632 (7th Cir. 1991) (citing *Foman v. Davis*, 371 U.S. 178, 183 (1962)).  Plaintiff contends that he has only learned of Bass's involvement through the discovery process, but the record does not support his contention.  To the contrary, Sergeant Bass's involvement was known to Carter at the time the conduct reports themselves were issued.  Defendants oppose the motion, and for good reason -- it is simply too late to insert another defendant in this action.  Accordingly, the court will deny plaintiff's motion for leave to amend his complaint to add Bass as a defendant.

Still, the question remains whether any of the current named defendants -- Radtke, Nickel, Leiser and Grams -- were sufficiently involved in the decision to

discipline Carter for the content of the letters underlying the 208 conduct reports to be held liable under § 1983.  While Radtke did not issue the reports, it is undisputed that he forwarded the letters to Bass for investigation, thus initiating the disciplinary actions. And while Nickel did not serve as the hearing officer, she screened the reports, classified all three as constituting major offenses, and allowed them to go forward.  Based on these actions, the court finds that a reasonable jury could find Radtke and Nickel personally involved in the disciplinary actions under § 1983.  In contrast, Carter fails to put forth any evidence of Leiser's involvement, other than as his advocate.  Similarly, while Carter appealed the disposition of these conduct reports to Grams' office, the evidence at summary judgment neither shows that Grams knew of the reports or their dispositions, nor of his other involvement, as to implicate him personally.  Accordingly, the court will grant summary judgment to Leiser and Grams and dismiss them from the lawsuit, but will allow Carter to proceed on his First Amendment retaliation claim premised on the 208 conduct reports against Radtke and Nickel.

Consistent with the court's treatment of Carter's other two First Amendment claims, judgment in Carter's favor on this claim would also appear appropriate. Defendants will, however, also have an opportunity to address why this might not be so pursuant to Fed. R. Civ. P. 56(f).

## II. ICRS Claims

Carter was also granted leave to proceed on a claim against Lane and Leiser based on their refusal to process his grievances.  (6/7/13 Opinion & Order (dkt. #30) 7.)  As far

as the court can discern -- and the parties do not indicate otherwise -- there is no independent claim at issue here.  Rather, Carter's claim (if he has one) must somehow implicate his First Amendment claim based on Radtke's blocking or censoring of his outgoing mail.[24]  The undisputed facts demonstrate that Leiser played no role in deciding whether to return, reject, dismiss or affirm Carter's offender complaints.  Lane was the sole decision-maker with Leiser fulfilling a pure administrative role at Lane's direction.  Lane's challenged actions consist of (1) returning or not accepting eleven offender complaints because Carter exceeded the two-per-week limitation; and (2) rejecting four offender complaints for various reasons.

Even though Carter represents that he had "good cause" for exceeding the two-per-week limitation, he utterly fails to develop this argument.  (Pl.'s Resp. to Defs.' PFOFs (dkt. #80) ¶ 190 (quoting Wis. Admin. Code § DOC 310.09(2)).)  Even if this were so, the court sees no basis for finding Lane liable based only on her application of the two-per-week limitation rule.  *See Riccardo v. Rausch*, 375 F.3d 521, 523 (7th Cir. 2004) ("Prisoners must follow state rules about the time and content of grievances."); *see also Lindell v. O'Donnell*, No. 06-1983, 2006 WL 3228601, at *1 (7th Cir. Nov. 8, 2006) (describing the two-per-week limitation in § DOC 310.09(2) in affirming district court's grant of summary judgment for failure to exhaust).

Even so, there remains one troubling aspect with Lane's record of returning complaints.  Defendants offer no explanation of how ICE chooses which complaints to

---

[24] For that reason, defendants correctly defined the universe of offender complaints at issue as those for which Lane acted as ICE and in which Carter's mail was blocked or censored.  (Defs.' PFOFs (dkt. #70) p.55 n.1.)

accept and which to return if more than two are received at the same time.  For example, on August 9, 2010, the ICE received at least four complaints from Carter.  Three were accepted, but the complaint alleging issues with his mail was not.  (Lane Aff., Ex. A (dkt. #73-1) p.35 (describing CCI-2010-16442 concerning CCI charging co-pay to inmates in non-wage status; CCI-2010-16398 concerning Carter's allegation that his mattress needs to be replaced; and CCI-2010-16486 concerning Carter's allegation that Mrs. M Petra is obstructing his court access).)  Two of the complaints were labeled "medical," which suggests those two were accepted as one complaint (and why three, rather than only two, complaints were accepted that week).  But there is no explanation as to why Carter's access to courts complaint was accepted instead of his mail complaint.  For prolific filers like Carter, ICE could theoretically pick and choose the complaints to accept, returning one raising more difficult issues.  Ultimately, however, an inmate should be responsible for prioritizing his claims in a given week.  Here, if Carter wanted his mail complaints to be accepted, he should have limited his filings to two complaints per week.

Carter also challenges Lane's rejection of four offender complaints. As detailed in the undisputed facts above, however, Lane followed ICRS procedures in rejecting these complaints (*see* Facts *supra* pp. 20-21), or, at the very least, plaintiff has failed to put forth any evidence to support his claim that ICE's review of his grievances implicated his First Amendment claims.

Accordingly, the court will grant summary judgment in favor of defendants Leiser and Lane and dismiss any claim premised on the ICRS process.

### III.  Qualified Immunity

Defendants also seek summary judgment on the basis of qualified immunity. After providing an extensive discussion of the law surrounding the qualified immunity defense, however, defendants' argument is limited to the following sentence:   "For Carter's constitutional claims, [C]arter must show that it was clear, to someone in defendants' positions, that defendants would violate Carter's constitutional rights by their actions and/or decisions."   (Defs.' Opening Br. (dkt. #69) 41.)   While it is plaintiff's burden to overcome the defense by demonstrating that the right at issue is clearly established under federal law, defendants bear some obligation in developing their defense.  *See Banaei v. Messing*, No. 12-3516, 2013 WL 6234599, at *5 (7th Cir. Dec. 3, 2013) (finding officer defendants failed to develop qualified immunity defense in a single sentence in appellate brief).  Even if developed, the First Amendment rights of prisoners to send outgoing mail *was* clearly established at the time Carter alleges defendants had no legitimate reason for screening his mail, censoring it, and subjecting him to disciplinary actions based on its content.  Based on the record before the court at summary judgment, the court will deny defendants' motion for qualified immunity.

### IV.  Supervisory Claims Against Raemisch

Finally, as to the supervisory claims asserted against former Secretary of the Department of Corrections Raemisch, the record demonstrates that he was entirely removed from the other defendants' actions here, having no knowledge of, or personal involvement in, *any* decision relating to issuing Carter conduct reports, the disciplinary

hearing or appeals concerning those reports.  Since Carter has failed to put forth any evidence that Raemisch had knowledge -- let alone the necessary purpose or intent -- to implicate him in the decision to screen or censor Carter's mail, or to discipline him based on the content of that mail, the court will grant defendants' motion as to all claims asserted against Raemisch.  *Vance v. Rumsfeld*, 701 F.3d 193, 204 (7th Cir. 2011) (*en banc*) (holding that knowledge of a subordinate's misconduct is not enough).


**V.  Next Steps**

As described above with respect to plaintiff's remaining First Amendment claims, the court will provide defendants an opportunity to raise any remaining issues of law or fact that would bar the entry of judgment in favor of Carter on the following claims:

- against defendant Radtke for screening (including reading) Carter's outgoing mail in retaliation for Carter's filing of a different lawsuit alleging mail tampering;

- against defendant Radtke for censoring Carter's outgoing mail because the censoring of his mail did not further an important or substantial governmental interest unrelated to the suppression of expression or is greater than necessary to the protection of the particular governmental interest involved; and

- against defendants Radtke and Nickel for subjecting Carter to disciplinary actions in retaliation for the content of Carter's outgoing mail.

Defendants may have until November 14, 2014, to file a brief and any supplementary materials.  Plaintiff may have until November 28, 2014 to file a response brief.  In addition to the question of liability, the parties should also address what remedy is warranted if the court enters judgment in Carter's favor.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #68) is GRANTED IN PART AND DENIED IN PART.  The motion is denied with respect to (1) a First Amendment retaliation claim against Radtke based on his decision to subject Carter's mail to special screening based on his complaints of mail tampering filed in a separate lawsuit; (2) a First Amendment claim against Radtke based on his decision to block or censor Carter's outgoing mail; and (3) a First Amendment retaliation claim against Radtke and Nickel based on the 208 conduct reports.  In all other respects, defendants' motion is granted, and defendants Grams, Raemisch, Lane, Leiser and Rogers are dismissed from this action.

2) Plaintiff's motion for leave to amend his complaint to add Sergeant Bass as a defendant (dkt. #85) is DENIED.

3) Defendants' brief as to why this court should not enter judgment in plaintiff's favor is due on or before November 14, 2014; plaintiff's response is due on or before November 28, 2014.

Entered this 30th day of October, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge